

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | § | |
|---|---|---|
| IN RE | § | |
| | § | |
| PORTER DEVELOPMENT | § | CASE NO. 15-31305-H5-7 |
| PARTNERS, LLC, ET AL., | § | |
| | § | |
| Debtors,[1] | § | (Jointly Administered) |
| | § | |

### ORDER

Before the Court are Bryan Stanley's "Motion to Allow Secured Claim #2" (Docket No. 25, Case No. 15-31770-H5-7) and the "Ellisor Claimants' Motion for Relief From Stay" (Docket No. 279, Case No. 15-31305-H5-7). The Ellisor Claimants seek relief from stay to file suit against Debtors for fraud in the merger between three investment funds. Stanley seeks allowance of his secured claim for funds loaned after the merger.

Following a hearing and after reviewing the evidence the Court concludes the Ellisor Claimants have failed to show cause. Stanley has proven his entitlement to a secured claim. The Court denies the motion for relief from stay and grants Stanley's motion to allow his claim.

---

[1] Debtors are Porter Development Partners, LLC; WB Murphy Road Development, LLC; Creekmont Plaza Partners, LP; Creekmont Plaza Partners GP, LLC; Replacement Sanctuary GP, LLC; WB Sanctuary GP, LLC; WB Chancel GP, LLC; WB 2610, LLC; Meadow Crest Developers GP, LLC; Morton & Porter, LP; Morton & Porter GP, LLC; Riata West Investment, LLC; Lakecrest Village Investments, LLC; WB Real Estate Holdings, LLC; US Public-Private Real Estate Fund I, LP; Wallace Bajjali Investment Fund II, LLP; West Houston WB Realty Fund, LP; WBIF II GP, LLC; WB Substitute GP, LLC; and PPP Management, LLC.

P:\porter.20180330.wpd

I. Background

The Ellisor Claimants are a group of investors who invested in three funds managed by David Wallace[2] and Costa Bajjali. Each of the funds held interests in special purpose entities to develop real estate. One of the funds (the Wallace Bajjali Investment Fund II, LP ("Fund II")) also held an interest in a Houston radio station, BizRadio.

The Debtors in this case are two of the three funds, the special purpose entities, and the holding company into which the three funds contributed their interests in the special purpose entities. Porter Development Partners, LLC and WB Murphy Road Development, LLC filed Chapter 7 petitions on March 3, 2015. Creekmont Plaza Partners, L.P. and Creekmont Plaza Partners GP, LLC filed Chapter 7 petitions on March 4, 2015. The remainder of the Debtors, including the holding company, WB Real Estate Holdings, LLC ("WBREH"), filed Chapter 7 petitions on April 2, 2015. Lowell T. Cage is the Chapter 7 Trustee in all of the cases.

Daniel Frishberg and Albert Kaleta promoted investments in the three funds to qualified investors through their radio program. The SEC filed a securities case in the United States District Court against Kaleta and obtained appointment of a receiver. The receiver took control of the radio station and Frishberg's investment business. The receiver sold the radio station.

During 2008 dislocations in the credit market caused a severe inability of any entity (whether profitable or not) to obtain bank financing of real estate transactions. In response to the credit crunch the three funds managed by Wallace and Bajjali merged by contributing their interests in real estate entities to a holding company (WBREH) in exchange for equity units of

---

[2]David Wallace is the debtor in Case No. 15-31594-H4-7. Wallace's Chapter 7 case is pending before the Honorable Jeff Bohm.

WBREH. After the merger Bryan Stanley loaned $1.6 million to WBREH secured by a pledge of its interests in the real estate entities.

Investors in the three funds (including most of the Ellisor Claimants) first objected to the sale of the radio station in the District Court litigation, asserting that they held secured claims against the radio station sale proceeds. The District Court determined that they had no security interest in the radio station proceeds.

The receiver in the District Court litigation entered into a settlement of claims against the three funds, Wallace, Bajjali, and two other entities (including Wallace and Bajjali's real estate development entity Wallace Bajjali Development Partners, L.P. ("WBDP")). Investors (including most of the Ellisor Claimants) objected to the settlement. The District Court held an evidentiary hearing and considered *in camera* information regarding Wallace and Bajjali's financial condition. The District Court approved the settlement over the investors' objection and entered an injunction barring them from asserting claims against the settling parties.

The investors next sought reconsideration of the settlement and bar order, asserting that Wallace and Bajjali had concealed from the District Court that WBDP had potential income from public-private real estate deals in Amarillo, Texas and Joplin, Missouri and planned to make an initial public offering of its equity. The District Court considered and rejected the investors' argument.

The investors next filed suit in state court against Frishberg, Wallace, Bajjali, the three funds, WBREH, WBDP, and others. WBREH, the three funds, and the real estate entities filed Chapter 7 bankruptcy petitions.

In these motions the Ellisor Claimants seek relief from stay to assert fraud claims in state court against several of the Debtors in this case and several persons and entities who are not Debtors in this case. They assert that the three funds' contribution of their interests in real estate entities to WBREH defrauded investors by making funds available for diversion from one project to another (including the radio station). They also assert that all the entities connected with Wallace and Bajjali are participants in a "Ponzi" scheme. The Chapter 7 Trustee, Stanley, and other investors, James Colling and Wayne English, oppose the Ellisor Claimants' motion.

Stanley seeks allowance of his secured claim against WBREH. The Ellisor Claimants oppose the allowance of Stanley's claim asserting it is barred by limitations. The Ellisor Claimants also contend Stanley participated in a Ponzi scheme by loaning money to WBREH. They contend the creation of WBREH was a sham and, thus, Stanley's loan indicates that he is a conspirator with Wallace and Bajjali.

The Trustee has liquidated most of the bankruptcy estates' interests in the single purpose entities. Significant cash assets remain in the Porter Development Partners, LLC, WB Murphy Road Development, LLC, WBREH, and Fund II cases.[3]

## II. Formation of the Funds

David Wallace, Costa Bajjali, and Will Perry formed Debtor WC Perry Properties Realty Fund, LP during 2006. (Tr. 3/26/2018, at 79). Perry ceased involvement with the fund and it was renamed the West Houston WB Realty Fund, LP ("Fund I"). Fund I invested in real estate properties. Prior to 2009 Fund I held interests in several real estate entities including Debtors:

---

[3]There are also non-cash assets in the WB Murphy Road Development LLC and WBREH cases.

Creekmont Plaza Partners, LP; Creekmont GP, LLC; Lakecrest Village Investment, LLC; Meadow Crest Developers GP, LLC; Morton & Porter, LP; Morton & Porter GP, LLC; Riata West Investment, LLC; and Meadow Crest Developers 226, LP.

Shortly before Perry's departure, Wallace and Bajjali set up Debtor Wallace Bajjali Investment Fund II, LP ("Fund II"). Prior to 2009 Fund II held interests in several real estate entities including Debtors: Porter Development Partners, LLC; WB 2610 LLC; WB Chancel GP, LLC; and WB Sanctuary GP, LLC. Fund II also invested a portion of its funds in BusinessRadio Network, LP ("BizRadio"). BizRadio operated radio station KTEK in Houston, Texas.

Prior to 2009, Wallace, Daniel Frishberg and Dr. Arthur Laffer set up the Laffer Frishberg Wallace Economic Opportunity Fund, LP (Fund III). Fund III is not a debtor in bankruptcy. Fund III held interests in Debtor: WB Murphy Road Development, LLC and in ZT Group Business Center One (Pearland), LP.

Wallace marketed the investments in Fund I, Fund II, and Fund III to individual investors. Bajjali testified the funds were structured to provide investors with a preferred return on their investments plus a return of their equity and a share of the profits. (Tr. 3/26/2018, at 76, 80).

### III. The Merger Transaction

Bajjali testified that in 2008 every one of the lenders on the real estate developments wanted the Wallace Bajjali entities to move loans to other lenders or make significant principal reductions to reduce their risk. He testified the lenders were not renewing loans, even performing loans, when they became due. (Tr. 3/26/2018, at 81, 83).

Douglas Shaffer (one of the Ellisor Claimants who invested in Fund I, Fund II, and Fund III) testified he received correspondence from Fund I, Fund II, and Fund III prior to the merger

advising him of the current market environment at the time. The correspondence advised Shaffer that (absent the merger) owners of real estate assets would have to provide additional equity, sell the asset at a huge discount prior to refinancing, or default on the loan and walk away from the investment. (Tr. 3/19/2018, at 80-82).

Shaffer testified that his understanding of the merger was that the funds were merged into one "so that the investments that were cash flow positive could shore up investments that were not cash flow positive and that we would--and our ownership would change and we would get a percentage of the entire deal." (Tr. 3/19/2018, at 82).

On May 26, 2009, Fund I, Fund II, and Fund III contributed their interests in real estate entities including those Debtor entities listed in the preceding section (at p. 4-5, *supra)*, to Debtor WB Real Estate Holdings, LLC ("WBREH") in exchange for units in WBREH. Other direct investors in WBREH hold equity interests in WBREH. The interests Fund II contributed to WBREH did not include Fund II's interest in BizRadio.

Shaffer testified he knew about the investments in BizRadio at the time of the merger. (Tr. 3/19/2018, at 71-72). He testified he did not object to the merger because he believed Wallace had promised a public offering to save what Shaffer termed "bad investments." (Tr. 3/19/2018, at 80).

Shaffer testified Wallace hired an appraiser to appraise all the properties and value the properties in order to determine what proportion of WBREH the holders of the funds would own. (Tr. 3/19/2018, at 83). He testified he believes the appraisal is flawed because Wallace and Bajjali supplied the appraiser with information regarding the cash flows of the various entities. (Tr. 3/26/2018, at 63). However, Shaffer never testified to any false or misleading statements in

the merger document on which he relied to his detriment. In fact, Wallace and Bajjali took exactly the actions represented in the "merger prospectus."

Bajjali testified he and Wallace obtained the appraisal to figure out a fair way to represent what each fund would own in the holding company. (Tr. 3/26/2018, at 91). He testified he and Wallace had no bias as to the proportional ownership of the holding company among the three funds. He testified the percentage would be based on the market condition, whatever the appraisal method was. (Tr. 3/26/2018, at 92).[4] The Court credits this testimony.

The Ellisor Claimants assert the merger was a fraudulent transaction because Wallace and Bajjali provided cash flow projections to the appraiser and they personally guaranteed some of the debt. This is an insufficient basis on which to infer fraud. There is no direct evidence to suggest that Wallace and Bajjali's cash flow projections were intended to divert funds from properties for which they had not executed personal guarantees to properties for which they had executed personal guarantees. The Ellisor Claimants have not presented sufficient evidence to support an inference of fraud in the merger transaction. Moreover, if there were fraud, it affects creditors generally, and thus the cause of action would be property of the bankruptcy estate to which the Ellisor Claimants lack direct standing. *See In re Educators Group Health Trust*, 25 F.3d 1281 (5th Cir. 1994).

### IV. The Kaleta Litigation in United States District Court

SEC filed the Kaleta Litigation on November 13, 2009, asserting securities fraud claims against Albert Kaleta and Kaleta Capital Management, Inc. ("KCM"), and asserting equitable

---

[4]The court infers Bajjali's testimony refers to conditions in the real estate and financial markets.

relief against BizRadio and Daniel Frishberg Financial Services, Inc. ("DFFS"). SEC asserted Kaleta solicited investors to KCM and used the funds invested to make worthless loans to BizRadio and DFFS. (Docket No. 1, C.A. No. 09-3674). On December 2, 2009, the District Court entered an order appointing Thomas Taylor III as receiver for KCM. (Docket No. 7, C.A. No. 09-3674). On June 17, 2010, the District Court expanded the receivership assets to include the assets of DFFS and BizRadio. (Docket No. 34, C.A. No. 09-3674).

On September 12, 2011, Taylor filed a motion in the Kaleta Litigation for approval of a settlement of claims of the receivership against David Wallace, Costa Bajjali, Fund I, Fund II, Fund III, Spring Cypress Investments, L.P., and Wallace Bajjali Development Partners, L.P. The motion identified the settling parties as the "Wallace Bajjali Parties." Taylor identified potential claims against the Wallace Bajjali Parties based on breach of contract, money had and received, fraudulent transfer, and unjust enrichment. Taylor also identified potential claims against the Wallace Bajjali Parties "arising from actions taken by them -- and not taken -- in relation to their involvement with BizRadio and its former directors and officers." (Docket No. 34, C.A. No. 09-3674).

A large number of investors (many of whom later became plaintiffs in the Ellisor Litigation and also became the Ellisor Claimants identified below) objected to Taylor's motion for approval of the settlement. (Docket No. 123, C.A. No. 09-3674).

On January 12, 2012, the District Court ordered Taylor to submit for *in camera* inspection financial documentation pertinent to the issue of collectability of judgments against the Wallace Bajjali Parties. (Docket No. 164, C.A. No. 09-3674).

The District Court overruled the investors' objection and approved the settlement between Taylor and the Wallace Bajjali Parties by order entered on February 7, 2012. The District Court held that a "Bar Order" barring for all time claims of BR Note Holders against the WB Parties[5] was a necessary component of the settlement. (Docket No. 170, C.A. No. 09-3674). The February 7, 2012 order defined what would and would not be barred:

> The Bar Order thus would enjoin these note holders (including the Objectors) from commencing or continuing any legal proceeding and/or asserting or prosecuting any causes of action against any of the WB Parties "arising out of, in connection with, or relating in any way to the [BR Note Plan]," loans made to the BR Entities or their related entities by the BR Note Holders, and/or notes issued by the BR Entities or their related entities to the BR Note Holders. The BR Note Holders (including the Objectors), however, would be able to assert their radio station loan-related claims through the claims process in the Receiver's ultimate plan of distribution of Receivership Assets.

(Docket No. 170, C.A. No. 09-3674) (footnotes omitted).

The investors who had previously objected to the settlement moved for reconsideration, asserting that Wallace and Bajjali had concealed sources of future income. (Docket No. 179, C.A. No. 09-3674).

On August 1, 2012, the District Court entered its "Order Approving Settlement and Entering Final Bar Order and Injunction." (Docket No. 210, C.A. No. 09-3674). The order provides:

> a. The term "Wallace Bajjali Parties" refers to David Wallace, Costa Bajjali, West Houston WB Realty Fund, L.P., Wallace Bajjali Investment Fund II, L.P., Laffer Frishberg Wallace Economic Opportunity Fund, L.P., Wallace Bajjali Development Partners, L.P., Spring Cypress Investments, LP, and their respective past, present, and future agents, officers, directors, employees, heirs, beneficiaries, representatives, relations

---

[5] The BR Note Holders are defined in the February 7, 2012 order as "the investors, their heirs, successors, agents and assigns, who subscribed to the [BR Note Plan] and/or made loans to [BR Entities or their affiliates] by or through any of the [WB Parties] as their agent." The WB Parties are defined as the Wallace Bajjali Parties identified above.

by blood and marriage, affiliates, predecessors, successors, assigns, and related entities,

b. The term "Receiver" refers to Thomas L. Taylor, III, solely in his capacity as Court-appointed Receiver in the above-styled action ("SEC Action") of Kaleta Capital Management, Inc., BusinessRadio Network, L.P. d/b/a BizRadio, Daniel Frishberg Financial Services, Inc, d/b/a DFFS Capital Management, Inc., and all of the entities they own or control (collectively, the "Receivership Entities").

c. The term "BusinessRadio Note Plan" refers to that plan or series of transactions whereby investors made loans to BusinessRadio Network, L.P. and/or any of its related entities (collectively, "BusinessRadio") by or through any of the Wallace Bajjali Parties as their agent.

d. The term "BusinessRadio Note Holders" refers to the investors, their heirs, successors, agents and assigns, who subscribed to the BusinessRadio Note Plan and/or made loans to BusinessRadio by or through any of the Wallace Bajjali Parties as their agent.

WHEREAS, on September 12, 2011, the Receiver filed a motion (Doc. #113) (the "Motion") (i) seeking a determination that the proposed settlement between the Receiver and the Wallace Bajjali Parties be deemed fair, equitable, reasonable, and in the best interest of the Receivership Estate and, thus, be approved by the Court; and (ii) seeking an Order, as a condition of the proposed settlement, permanently barring or enjoining any and all BusinessRadio Note Holders from commencing or continuing any judicial, administrative, arbitration, or other proceeding and/or asserting or prosecuting any claims and/or causes of action against any of the Wallace Bajjali Parties arising out of, in connection with, or relating in any way to the BusinessRadio Note Plan, the loans made to BusinessRadio or its related entities by the BusinessRadio Note Holders, and/or the notes issued by BusinessRadio or its related entities to the BusinessRadio Note Holders, and

WHEREAS, due and proper notice of the Motion, the proposed settlement, and any hearing on the Motion, has been given to all interested persons, and the Court has considered the papers filed and arguments made by the Receiver in support of his Motion, and any objections to the Motion, and such other and further evidence as has been presented to the Court.

NOW, THEREFORE, it is hereby ORDERED that:

I. The Motion is GRANTED;

II. The settlement between the Receiver and the Wallace Bajjali Parties, as specifically provided for in the Compromise Settlement and Release Agreement, attached to the Motion as Exhibit I, is hereby approved;

III. Any and all of the BusinessRadio Note Holders are hereby permanently barred, restrained, and enjoined, consistent with general equitable principles and in accordance with this Court's ancillary equitable jurisdiction in this matter, from commencing or continuing any judicial, administrative, arbitration, or other proceeding and/or asserting or prosecuting any claims and/or causes of action against any of the Wallace Bajjali Parties arising out of, in connection with, or relating in any way to the BusinessRadio Note Plan, the loans made to BusinessRadio or its related entities by the BusinessRadio Note Holders, and/or the notes issued by BusinessRadio or its related entities to the BusinessRadio Note Holders;

IV. Neither the Wallace Bajjali Parties' settlement with the Receiver, nor any of the settlement's terms or provisions, nor any of the negotiations or proceedings in connection with the settlement, nor any of the documents or statements referred to therein shall be construed as or deemed in any judicial, administrative, arbitration or other type of proceeding to be evidence of a presumption, concession, or an admission by the Wallace Bajjali Parties of the truth of any fact alleged or the validity of any claim that has been, could have been, or in the future might be asserted in the SEC Action or any other judicial, administrative, arbitration or other proceeding;

V. The rights of the BusinessRadio Note Holders to participate in the claims process for the Receiver's ultimate plan of distribution for the Receivership Estate shall not be impaired by this Order;

VI. The Court shall have and retain jurisdiction over all matters related to the administration, interpretation, effectuation, or enforcement of this Order, the Compromise Settlement and Release Agreement between the Wallace Bajjali Parties and the Receiver, and any related disputes;

VII. There being no just cause for delay, this Order is, and is intended to be, a final, appealable decision of the Court within the meaning of Rule 54(b) of the Federal Rules of Civil Procedure.

VIII. The clerk shall promptly serve copies of this Order upon all parties to the SEC Action.

(Docket No. 210, C.A. No. 09-3674).

The investors who objected to the settlement appealed its approval. (Docket No. 214, C.A. No. 09-3674). The Fifth Circuit affirmed the District Court's approval of the settlement on June 19, 2013. (Doc. No. 00512307856, Case No. 12-20633).

## V. The Ellisor Litigation in State Court

On June 25, 2014, Ronald Ellisor and 51 other individuals[6] who invested in Fund I, Fund II, and Fund III filed suit (the "Ellisor Litigation") in state court against Daniel Frishberg and others including David Wallace, Fund I, Fund II, Fund III, and WBREH. Five individuals and a limited partnership intervened as plaintiffs. (Trustee's Exhibit 6). The Ellisor Claimants who seek relief from stay in this case include a large subset of the plaintiffs and intervenors in the Ellisor Litigation, and additional individuals and entities who are not named as state court plaintiffs or intervenors.[7]

The state court Plaintiffs and Intervenors filed their Eighth Amended Petition in state court on June 19, 2017. In the petition, they assert claims for negligence and negligent misrepresentation against entities other than Debtors related to BizRadio investments. They assert generally that the nondebtor defendants grossly misrepresented the financial condition and economic viability of BizRadio. They assert BizRadio was a Ponzi scheme which depended on drawing new investments through the Debtor entities into BizRadio to survive. (Trustee's Exhibit 6).

---

[6]Some also sued on behalf of entities and apparently one probate estate.

[7]The Ellisor Claimants are identified in the motion for relief from stay as Ron Ellisor, Stephen Cook, Doug & Kay Shaffer, Robert Resch, Robert Ficks, Richard Kadlick, Richard Burkhardt, Raymond Warner, Nada Por Nada, Ltd., Kohur Subramanian, Phillip Jones, Alisa Jones, ZT Perry Fund, L.P., Paul & Simona Williams, Florence Reiley, Sanjiv & Renu Khanna, Kurt Everson, Tim Koehl, Michelle Kuykendall, Martin Grosboll, Marcus Erickson, Dr. Lawrence Root, ROCAM, Ltd., Dr. Lawrence Root MD PA Employee Profit Sharing Plan, Larry Mullins, Kevin & Laurie Deering, James & Patricia Stewart, Hal Tompkins, George Lingenfelder, Tompkins Inc Profit Sharing Plan, Tompkins 2007 Family Partnership, L.P., Gary Seever, Fred Shuffler, Ellis Couch, Ed & Helen Gray, Gerald & Andrea Crouch, 5C Post Oak Family Limited Partnership, L.P., Martha Keil, Don & Martha Keil, Carlos Barberi, Horlander, L.L.C., Betty Gauntt, Anita Chandler and Allison K. Cameron.

VI. <u>Final Actions in the Kaleta Litigation</u>

Debtors filed the petitions in these Chapter 7 cases in March and April 2015. On August 31, 2015, the state court plaintiffs sought modification of the August 1, 2012 Bar Order, citing alleged falsehoods in the financial documents the District Court reviewed *in camera* in determining to approve the settlement. Specifically, the state court plaintiffs asserted that Wallace and Bajjali overstated the status and value of their projects in Amarillo, Texas and Joplin, Missouri. (Docket No. 286, C.A. No. 09-3674)[8]. The District Court denied modification of the Bar Order by order entered on September 29, 2015. (Docket No. 294, C.A. No. 09-3674).

On June 24, 2016, Taylor moved for approval of a final distribution plan for the receivership assets. (Docket No. 299, C.A. No. 09-3674). The District Court approved the final distribution plan on July 19, 2016. (Docket No. 300, C.A. No. 09-3674). On December 8, 2016, Taylor moved for approval of the final distribution of the assets, and requested that he be discharged as receiver. (Docket No. 305, C.A. No. 09-3674). The District Court granted Taylor's motion on January 5, 2017. (Docket No. 310, C.A. No. 09-3674).

VII. <u>The Automatic Stay Should Remain In Effect</u>

Section 362(d)(1) of the Bankruptcy Code provides that the court shall grant relief from stay for cause. The Bankruptcy Code does not precisely define cause for lifting the stay. *In re Mirant Corp.*, 440 F.3d 238 (5th Cir. 2006). Courts determine whether cause exists on a case-by-case basis. *Matter of Reitnauer*, 152 F.3d 341 (5th Cir. 1998). In determining whether cause exists, the Court must balance the inherent hardships on all parties and base its decision upon the degree of hardship and the overall goals of the Bankruptcy Code. *Matter of Northtown*

---

[8]Amarillo and Joplin later canceled the contracts.

*Mall Assoc.*, 3 F.3d 436 (5th Cir. 1993), *citing In re Opelika Mfg. Corp.*, 66 B.R. 444 (Bankr. N.D. Ill. 1986).

The Chapter 7 Trustee testified that if the Ellisor Claimants' litigation were permitted to continue in state court against the Debtors, the estates would incur approximately $500,000 in legal fees as additional administrative expenses of the estates. He testified he has reviewed the books and records of all the Debtors. He testified Debtors' books and records reflect Debtors' operations both before and after the merger. He testified he has found nothing in the books and records to evidence fraud. He testified he conferred with Taylor, Bajjali, counsel for Stanley, and counsel for the Ellisor Claimants. He testified he reviewed the formation documents for the Debtors and the proceedings before the District Court.

The elements of fraud are: (1) that a material representation was made; (2) the representation was false; (3) when the representation was made, the speaker knew it was false or made it recklessly without any knowledge of the truth and as a positive assertion; (4) the speaker made the representation with the intent that the other party should act upon it; (5) the party acted in reliance on the representation; and (6) the party thereby suffered injury. *Formosa Plastics Corp. v. Presidio Engrs. & Contractors, Inc.*, 960 S.W.2d 41 (Tex. 1998).

Shaffer testified he does not believe any of the information was intended to fool him or the other investors. He testified there was nothing in the merger statements that was a lie. (Tr. 3/26/2018, at 64-65). The facts shown constitute mere puffing and do not raise a colorable claim of fraud.

There is no purpose in lifting the stay to permit additional litigation. The Ellisor Claimants have failed to show fraud. Each of the claimants was notified of the effects of the

merger including the possibility that funds would be used for the radio station. No one objected to the merger. The Trustee has examined the Debtors' books and records and has not found anything to indicate fraud or a Ponzi scheme. The District Court's Bar Order appears it may preclude the claims the Ellisor Claimants seek to assert.

VIII. <u>Stanley's Secured Claim Should Be Allowed</u>

Bryan Stanley filed a proof of claim for $1,676,000 in the WBREH case secured by WBREH's ownership interests in 35 entities, including most of the single purpose entities. (Stanley Exhibits 001, 003). Stanley executed a loan agreement with WBREH, Wallace, and Bajjali on December 2, 2010 under which Stanley loaned $1,600,000 to WBREH. Wallace and Bajjali signed as guarantors. (Stanley Exhibit 004, 005, and 006). Stanley filed a UCC Financing Statement with the Texas Secretary of State on March 31, 2015. (Stanley Exhibit 011).

Stanley testified Wallace (who was Stanley's neighbor) approached him with a request to loan money on a secured basis. (Tr. 3/19/2018, at 101). He testified he had no previous connections to Wallace or any of his business enterprises. (Tr. 3/19/2018, at 102). He testified he had attorneys help him to negotiate the loan and review the loan documents. (Tr. 3/19/2018, at 102). He testified his attorneys conducted due diligence regarding the transaction to determine that the entities pledged as security owned the properties they purported to own. (Tr. 3/19/2018, at 139-140).

Stanley testified he stopped receiving payments on the note in the third quarter of 2014. (Tr. 3/19/2018, at 102).

The Ellisor Claimants assert Stanley's debt should not be allowed due to limitations and due to their allegations of a Ponzi scheme which if successful would result (in their opinion) in disregarding WBREH as an entity.  The Ellisor Claimants have not shown the existence of a Ponzi scheme.  The only evidence they point to is that Wallace and Bajjali were in control of each of the entities and provided information regarding their cash flow to the appraiser in determining what percentages of ownership each fund would have in WBREH.  Moreover, Stanley made his loan after the merger took place, and there is nothing to tie Stanley to the alleged scheme.  Stanley's loan was an ordinary secured loan on ordinary terms, and is allowed.

Signed at Houston, Texas on March 30, 2018.

_____
KAREN K. BROWN
UNITED STATES BANKRUPTCY JUDGE